UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

MYIA MCMILLIAN, individually and as next
friend of two minor children, J.M and K.M.;
AMANDA FETTERMAN, individually and as
next friend of four minor children, R. E., K.E.,
S. E., and R.E.; MELISSA LIGHTFOOT,
individually and as next friend of three minor
children T.L., K.A., and P.A.; PATRICIA
FUNCHES, individually and as next friend of one
minor child, M.T.; AMBER BROWN,
individually and as next friend of one minor child,
K.D.; TIESHA TIPTON, individually and as next
friend of four minor children, A.T., A.S., A.S.,
and A.S.; MARY MATHES, individually and as
next friend of two minor children, S.A.M. and
S.A.M.;

**JURY TRIAL**

**DEMANDED**

No. 2:16 –cv-10796

*Plaintiffs,*

v.

GOVERNOR RICHARD DALE SNYDER, in his
official capacity, and the STATE OF MICHIGAN
for prospective relief only; DANIEL WYANT,
LIANE SHEKTER SMITH, ADAM
ROSENTHAL, STEPHEN BUSCH, PATRICK
COOK, MICHAEL PRYSBY, BRADLEY
WURFEL all in their individual capacities;
DARNELL EARLEY, GERALD AMBROSE,
DAYNE WALLING, HOWARD CROFT,
MICHAEL GLASGOW and DAUGHERTY
JOHNSON in their individual and official
capacities, CITY OF FLINT, a municipal
corporation, jointly and severally, LOCKWOOD,
ANDREWS & NEWMAN, P.C., a Michigan
corporation, LOCKWOOD, ANDREWS &
NEWMAN, INC., a Texas Corporation, and LEO
A. DALY COMPANY, a Nebraska corporation,

**CLASS ACTION**

**COMPLAINT**

*Defendants.*

**NAPOLI SHKOLNIK PLLC**

By:   /s/ Hunter Shkolnik
Hunter Shkolnik, #2031458NY
Paul J. Napoli, #2513141NY
1301 Avenue of the Americas, Tenth Floor
New York, NY, 10019
(212) 397-1000
hunter@napolilaw.com
pnapoli@napolilaw.com

**SLATER SLATER SCHULMAN LLP**

By:   /s/ Adam Slater
Adam P. Slater, *Pro Hac Pending*
Jonathan E. Schulman, *Pro Hac Pending*
909 Third Avenue, Twenty Eighth Floor
New York, NY, 10022
(212) 922-0906
aslater@sssfirm.com
jschulman@sssfirm.com

## COMPLAINT FOR MONEY DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF WITH RELIANCE ON JURY DEMAND FOR VIOLATIONS OF THE SAFE DRINKING WATER ACT 42 U.S.C. §300f et seq., AND THE LEAD AND COPPER RULE 40 C.F.R. §§141.80-.91

### INTRODUCTION

"No safe blood level in children has been identified. Lead exposure can affect nearly every system in the body."

National Cancer for Environmental Health, Division of Emergency and Environmental Health Services

Plaintiffs, for themselves and all similarly situated people allege:

1.     Plaintiffs seek recovery from Defendants individually and on behalf of the tens of thousands of Flint residents (the "Class" or "Class Members") for injuries, damages and losses suffered by the Plaintiffs, each of whom suffered injuries as a result of exposure to the introduction of lead and other toxic substances from Defendants' ownership, use, management, supervision, storage, maintenance, disposal and release of highly corrosive water from the Flint River into the drinking water of Flint, Michigan.

2.      At critical times including during gestation and their developmental years, the minor plaintiffs have been exposed to damaging levels of lead and other toxic substances.  Plaintiffs' damages and losses include, but are not limited to, physical and psychological injuries, learning and other permanent disabilities, weight loss, stunted growth, anemia, headaches, abdominal and other pain, mental anguish, emotional distress, the cost of medical, educational, and rehabilitation expenses, other expenses of training and assistance, loss of income and earning capacity, property damage, destruction of water service lines, and devaluation in property damages.

3.      Plaintiffs and the Class, at the time of sustaining the injuries complained of herein, have been the owners, lessees and/or occupants of certain real property consisting of various lands and various types of residences located in Flint, Michigan, that received highly corrosive and contaminated water pumped from the Flint, River.

4.      In 2014, Defendants discovered that dangerous levels of lead were leaching into Flint's drinking water.  Not only did Defendants fail to take any measures to eliminate this danger, as required by federal law, but they actually took affirmative steps to downplay the severity of the contamination from its citizens.  In so doing, Defendants negligently and recklessly exposed the entire population of Flint, including Plaintiffs and the Class, to devastating and irreversible health problems.

5.      Due to the negligent, willful, and/or wanton actions of Defendants, an unknown quantities of toxic chemicals, including but not limited to lead particles, have been released into the public drinking water supply relied upon by the entire City of Flint, and, most importantly, the Plaintiffs and the Class herein.

6.      Upon information and belief, Defendants, who were acting under the color of law, deprived Plaintiffs and the Class of their rights under the 14th Amendment to the United States Constitution.  Specifically, Defendants deprived Plaintiffs and the Class of life, liberty and property without due process of law when the decision to switch to the Flint River was made, thus providing Plaintiffs and the Class with toxic and unsafe water.

7.      The health effects of lead poisoning are well known.  The CDC has noted that: "No safe blood level in children has been identified.  Even low levels in blood have been shown to affect IQ, ability to pay attention, and academic achievement."  Lead impacts nearly every organ and system in the human body. Lead causes multitudinous and serious injuries to the nervous system, which can lead to convulsions, coma and brain death.  It causes learning and behavioral disorders, memory loss, nausea, anemia, hearing loss, fatigue, colic, hypertension, and myalgia.  Moreover, children under the age of 6 years old are more susceptible to the toxic effects of lead than are adults since the brain and central nervous system are not completely developed.

4

8.      Defendants' failure to remediate the lead crisis they caused by switching to the Flint River violated the constitutional rights of Plaintiffs and the Class by acting in a manner that shocks the conscience.

9.      Plaintiffs and the Class allege that, as a direct result of Defendants' reckless, negligent, and grossly negligent conduct, they were exposed to lead and other toxic substances that were caused to be released from lead supply pipes by Defendants into the environment, as a result of Defendants' use of highly corrosive and untreated water from the Flint River.  Plaintiffs and the Class further allege that, as a direct result of Defendants' reckless, negligent and grossly negligent conduct, Plaintiffs and the Class have inhaled, ingested or otherwise absorbed lead and other toxic substances into their bodies, and that the exposure to these substances directly and proximately caused their injuries.

10.     Plaintiffs and the Class allege that, as a direct result of Defendants' reckless, negligent and grossly negligent conduct, Plaintiffs and the Class were directly exposed to lead and other toxic substances known to cause disease, and that this exposure caused or contributed to their injuries.  Therefore, the doctrine of joint and several liability should be extended to apply to each Defendant herein.

11.     As a direct and proximate result of the Defendants' conduct, Plaintiffs and the Class have suffered injuries and currently suffer and will continue to suffer damages and losses which include, but are not limited to, physical and psychological injuries, learning and other permanent disabilities, pain, mental anguish, emotional

5

distress, the loss of household services, the cost of medical, educational and

rehabilitation expenses and other expenses of training and assistance, loss of

earnings, income, and earning capacity, property damage, and loss of property value.

Such injuries, damages and loses are reasonably likely to continue to occur in the

future.

## THE PARTIES: PLAINTIFFS

12.    Plaintiff Myia McMillian, individually and as next of friend to two

minor children, has resided at 225 W. Pulaski St., in the city of Flint, in the county

of Genesee, in the state of Michigan at all relevant times.  Since April 25, 2014,

Plaintiff McMillian and the two minor children living with her continue to be

exposed to highly dangerous conditions created by Defendants' decision to switch to

the Flint River, and Defendants' continued failure to remediate these harmful and

toxic conditions.

13.    Plaintiff McMillian is mother and next of friend of two minor children,

J.M., age 5, and K.M., age 2.

14.    The McMillian family, at all relevant times, lived in a single family

home at 225 W. Pulaski St., Flint, Michigan.

15.    At all relevant times, members of the McMillian family, unaware of the

toxicity of their water, regularly used the water for drinking and other household

necessities such as bathing, cooking, and cleaning.  Defendants continuously led the

McMillian family to believe that there was nothing wrong with Flint's water, and

6

that it was safe for consumption.  As a result of Defendants' assurances, the

McMillian family continued to use and rely upon Flint's water.

16.    As a proximate result of Defendants' actions, as set forth herein, the

McMillian family has experienced serious physical and emotional injury due to their

exposure to the toxic water, including but not limited to:

      a.  high levels of lead and copper in their bloodstreams, brains, bones
         and other organs;
      b.  skin rashes and other skin problems;
      c.  hair loss;
      d.  digestive problems;
      e.  infections;
      f.  sleeping disorders;
      g.  neurological disorders such as "brain fog", seizure like convulsions,
         vison loss, memory loss; and
      h.  psychological disorders such as depression, chronic anxiety, post-
         traumatic stress disorder and an inability to cope with  normal stress.

17.    As a proximate result of Defendants' actions, as set forth herein, minor

Plaintiffs J.M. and K.M. have experienced heightened levels of lead in their blood.

18.     As a proximate result of Defendants' actions, as set forth herein,

Plaintiff Myia McMillian has experienced property damage from Flint's use of

corrosive Flint River water including but not limited to the destruction of service

pipe lines and loss in property value.

19.    Plaintiff Amanda Fetterman, individually and as next of friend to four

minor children, has resided at 1018 Decker St., in the city of Flint, in the county of

Genesee, in the state of Michigan at all relevant times.  Since April 25, 2014,

Plaintiff Amanda Fetterman and the four minor children living with her continue to

7

be exposed to highly dangerous conditions created by Defendants' decision to switch to the Flint River, and Defendants' continued failure to remediate these harmful and toxic conditions.

20.     Plaintiff Amanda Fetterman is the mother and next of friend of four minor children: R.E., age 6; K.E., age 5; S.E., age 4; and R.E., age 2.

21.     The Fetterman family, at all relevant times, lived in a single family home at 1018 Decker St., Flint, Michigan.

22.     At all relevant times, members of the Fetterman family, unaware of the toxicity of their water, regularly used the water for drinking and other household necessities such as bathing, cooking, and cleaning.  Defendants continuously led the Fetterman family to believe that there was nothing wrong with Flint's water, and that it was safe for consumption.  As a result of Defendants' assurances, the Fetterman family continued to use and rely upon Flint's water.

23.     As a proximate result of Defendants' actions, as set forth herein, the Fetterman family has experienced serious physical and emotional injury due to their exposure to the toxic water, including but not limited to:

   a.  high levels of lead and copper in their bloodstreams, brains, bones and other organs;
   b.  skin rashes and other skin problems;
   c.  hair loss;
   d.  digestive problems;
   e.  infections;
   f.  sleeping disorders;
   g.  neurological disorders such as "brain fog", seizure like convulsions, vison loss, memory loss; and

8

h. psychological disorders such as depression, chronic anxiety, post-traumatic stress disorder and an inability to cope with normal stress.

24. As a proximate result of Defendants' actions, as set forth herein, minor Plaintiffs R.E., K.E., S.E, and R.E. have experienced heightened levels of lead in their blood.

25. As a proximate result of Defendants' actions, as set forth herein, Plaintiff Amanda Fetterman has experienced property damage from Flint's use of corrosive Flint River water including but not limited to the destruction of service pipe lines and loss in property value.

26. Plaintiff Melissa Lightfoot, individually and as next of friend to three minor children, has resided at 3120 Stonegate Dr., in the city of Flint, in the county of Genesee, in the state of Michigan at all relevant times. Since April 25, 2014, Plaintiff Melissa Lightfoot and the three minor children living with her continue to be exposed to highly dangerous conditions created by Defendants' decision to switch to the Flint River, and Defendants' continued failure to remediate these harmful and toxic conditions.

27. Plaintiff Melissa Lightfoot is mother and next of friend of three minor children: T.L., age 13; K.A., age 8; and P.A., age 5.

28. The Lightfoot family, at all relevant times, lived in a single family home at 3120 Stonegate Dr., Flint, Michigan.

9

29.    At all relevant times, members of the Lightfoot family, unaware of the toxicity of their water, regularly used the water for drinking and other household necessities such as bathing, cooking, and cleaning.  Defendants continuously led the Lightfoot family to believe that there was nothing wrong with Flint's water, and that it was safe for consumption.  As a result of Defendants' assurances, the Lightfoot family continued to use and rely upon Flint's water.

30.    As a proximate result of Defendants' actions, as set forth herein, the Lightfoot family has experienced serious physical and emotional injury due to their exposure to the toxic water, including but not limited to:

      a.  high levels of lead and copper in their bloodstreams, brains, bones and other organs;
      b.  skin rashes and other skin problems;
      c.  hair loss;
      d.  digestive problems;
      e.  learning problems;
      f.  infections;
      g.  sleeping disorders;
      h.  neurological disorders such as "brain fog", seizure like convulsions, vison loss, memory loss; and
      i.  psychological disorders such as depression, chronic anxiety, post-traumatic stress disorder and an inability to cope with  normal stress.

31.    As a proximate result of Defendants' actions, as set forth herein, minor Plaintiffs T.L., K.A., and P.A. have experienced heightened levels of lead in their blood.

32.     As a proximate result of Defendants' actions, as set forth herein, Plaintiff Melissa Lightfoot has experienced property damage from Flint's use of

10

corrosive Flint River water including but not limited to the destruction of service pipe lines and loss in property value.

33.     Plaintiff Patricia Funches, individually and as next of friend to one minor child, has resided at 805 W. Marengo, in the city of Flint, in the county of Genesee, in the state of Michigan at all relevant times.  Since April 25, 2014, Plaintiff Patricia Funches and the minor child living with her continue to be exposed to highly dangerous conditions created by Defendants' decision to switch to the Flint River, and Defendants' continued failure to remediate these harmful and toxic conditions.

34.     Plaintiff Patricia Funches is the mother and next of friend of one minor child, M.T., age 2.

35.     The Funches family, at all relevant times, lived in a single family home at 805 W. Marengo, Flint, Michigan.

36.     At all relevant times, members of the Funches family, unaware of the toxicity of their water, regularly used the water for drinking and other household necessities such as bathing, cooking, and cleaning.  Defendants continuously led the Funches family to believe that there was nothing wrong with Flint's water, and that it was safe for consumption.  As a result of Defendants' assurances, the Funches family continued to use and rely upon Flint's water.

11

37.     As a proximate result of Defendants' actions, as set forth herein, the Funches family has experienced serious physical and emotional injury due to their exposure to the toxic water, including but not limited to:

      a. high levels of lead and copper in their bloodstreams, brains, bones and other organs;
      b. skin rashes and other skin problems;
      c. digestive problems;
      d. learning problems, including language disability;
      e. infections;
      f. sleeping disorders;
      g. neurological disorders such as "brain fog", seizure like convulsions, vison loss, memory loss; and
      h. psychological disorders such as depression, chronic anxiety, post-traumatic stress disorder and an inability to cope with normal stress.

38.     As a proximate result of Defendants' actions, as set forth herein, minor Plaintiff M.T. has experienced heightened levels of lead in his blood.

39.     As a proximate result of Defendants' actions, as set forth herein, Plaintiff Patricia Funches has experienced property damage from Flint's use of corrosive Flint River water including but not limited to the destruction of service pipe lines and loss in property value.

40.     Plaintiff Amber Brown, individually and as next of friend to one minor child, has resided at 5101 Branch Road, in the city of Flint, in the county of Genesee, in the state of Michigan at all relevant times.  Since April 25, 2014, Plaintiff Amber Brown and the minor child living with her continue to be exposed to highly dangerous conditions created by Defendants' decision to switch to the Flint

12

River, and Defendants' continued failure to remediate these harmful and toxic conditions.

41.     Plaintiff Amber Brown is the mother and next of friend of one minor child, K.D., age 1.

42.     The Brown family, at all relevant times, lived in a single family home at 5101 Branch Road, Flint, Michigan.

43.     At all relevant times, members of the Brown family, unaware of the toxicity of their water, regularly used the water for drinking and other household necessities such as bathing, cooking, and cleaning.  Defendants continuously led the Brown family to believe that there was nothing wrong with Flint's water, and that it was safe for consumption.  As a result of Defendants' assurances, the Brown family continued to use and rely upon Flint's water.

44.     As a proximate result of Defendants' actions, as set forth herein, the Brown family has experienced serious physical and emotional injury due to their exposure to the toxic water, including but not limited to:

      a. high levels of lead and copper in their bloodstreams, brains, bones and other organs;
      b. digestive problems;
      c. infections; and
      d. learning problems, such as language disability;

45.     As a proximate result of Defendants' actions, as set forth herein, minor Plaintiff K.D. has experienced heightened levels of lead in her blood.

46.   As a proximate result of Defendants' actions, as set forth herein, Plaintiff Amber Brown has experienced property damage from Flint's use of corrosive Flint River water including but not limited to the destruction of service pipe lines and loss in property value.

47.   Plaintiff Tiesha Tipton, individually and as next of friend to four minor children, has resided at 313 Page St., in the city of Flint, in the county of Genesee, in the state of Michigan at all relevant times.  Since April 25, 2014, Plaintiff Tiesha Tipton and the minor children living with her continue to be exposed to highly dangerous conditions created by Defendants' decision to switch to the Flint River, and Defendants' continued failure to remediate these harmful and toxic conditions.

48.   Plaintiff Tiesha Tipton is the mother and next of friend of four minor children: A.T., age 7; A.S., age 4; A.S., age 4; and A.S., age 2.

49.   The Tipton family, at all relevant times, lived in a single family home at 313 Page St., Flint, Michigan.

50.   At all relevant times, members of the Tipton family, unaware of the toxicity of their water, regularly used the water for drinking and other household necessities such as bathing, cooking, and cleaning.  Defendants continuously led the Tipton family to believe that there was nothing wrong with Flint's water, and that it was safe for consumption.  As a result of Defendants' assurances, the Tipton family continued to use and rely upon Flint's water.

14

51.    As a proximate result of Defendants' actions, as set forth herein, the Tipton family has experienced serious physical and emotional injury due to their exposure to the toxic water, including but not limited to:

    a. high levels of lead and copper in their bloodstreams, brains, bones and other organs;
    b. skin rashes and other skin problems;
    c. learning problems;
    d. hair loss;
    e. digestive problems;
    f. hyperactivity;
    g. neurological disorders such as "brain fog", seizure like convulsions, vison loss, memory loss; and
    h. psychological disorders such as depression, chronic anxiety, post-traumatic stress disorder and an inability to cope with normal stress.

52.    As a proximate result of Defendants' actions, as set forth herein, minor Plaintiffs A.T., A.S., A.S., and A.S. have experienced heightened levels of lead in their blood.

53.    As a proximate result of Defendants' actions, as set forth herein, Plaintiff Tiesha Tipton has experienced property damage from Flint's use of corrosive Flint River water including but not limited to the destruction of service pipe lines and loss in property value.

54.    Plaintiff Mary Mathes, individually and as next of friend to two minor children, has resided at 1210 Walker St., in the city of Flint, in the county of Genesee, in the state of Michigan at all relevant times. Since April 25, 2014, Plaintiff Mary Mathes and the minor children living with her continue to be exposed to highly dangerous conditions created by Defendants' decision to switch to the Flint

River, and Defendants' continued failure to remediate these harmful and toxic conditions.

55.     Plaintiff Mary Mathes is the mother and next of friend of two minor children: S.A.M., age 10; and S.A.M., age 6.

56.     The Mathes family, at all relevant times, lived in a single family home at 1210 Walker St., Flint, Michigan.

57.     At all relevant times, members of the Mathes family, unaware of the toxicity of their water, regularly used the water for drinking and other household necessities such as bathing, cooking, and cleaning.  Defendants continuously led the Mathes family to believe that there was nothing wrong with Flint's water, and that it was safe for consumption.  As a result of Defendants' assurances, the Mathes family continued to use and rely upon Flint's water.

58.     As a proximate result of Defendants' actions, as set forth herein, the Mathes family has experienced serious physical and emotional injury due to their exposure to the toxic water, including but not limited to:

    a.  high levels of lead and copper in their bloodstreams, brains, bones and other organs;
    b.  skin rashes and other skin problems; and
    c.  learning problems;

59.     As a proximate result of Defendants' actions, as set forth herein, minor Plaintiffs S.A.M. and S.A.M. have experienced heightened levels of lead in their blood.

16

60.     As a proximate result of Defendants' actions, as set forth herein, Plaintiff Mary Mathes has experienced property damage from Flint's use of corrosive Flint River water including but not limited to the destruction of service pipe lines and loss in property value.

## THE PARTIES: DEFENDANTS

61.     All individually named Defendants are sued in their individual and/or official capacities as indicated below.

62.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

63.     The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.  The term "Governmental Defendants" refers to those individuals or entities associated with the State of Michigan, City of Flint, or Michigan Department of Environmental Quality.

64.     Upon information and belief, each of the Defendants are responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and

17

damages legally thereby to Plaintiffs and the Class, as alleged, either through each Defendant's own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

65.     Defendant RICHARD DALE SNYDER is sued in his official capacity as Governor of the State of Michigan.  At all times relevant hereto, Defendant Snyder was acting individually and in his official capacity as State Governor and top policymaker for the State of Michigan.

66.     Defendant STATE OF MICHIGAN is sued in its capacity of operating the Michigan Department of Environmental Quality ("MDEQ").  At all times relevant hereto, Defendant State of Michigan is sued in its capacity as manager of the environmental agency tasked with protecting the environment and the residents of Michigan from environmental dangers.

67.     Defendant DANIEL WYANT ("Wyant") is sued in his official capacity as Director of MDEQ.  At all times relevant hereto, Defendant Wyant was acting individually and in his official capacity of Director of MDEQ and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

68.     Defendant LIANE SHEKTER SMITH ("Smith") is sued in her official capacity as Chief of the Office of Drinking Water and Municipal Assistance for MDEQ.  At all time relevant hereto, Defendant Smith was acting individually and in

18

her official capacity as Chief of the Office of Drinking Water and Municipal Assistance for MDEQ, and is sued for her participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

69.     Defendant ADAM ROSENTHAL ("Rosenthal") is sued in his official capacity as a Water Quality Analyst assigned to the Lansing District Office of the MDEQ.  At all times relevant hereto, Defendant Rosenthal was acting individually and in his official capacity as a Water Quality Analyst, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

70.     Defendant STEPHEN BUSCH ("Busch") is sued in his official capacity as District Supervisor assigned to the Lansing District Office of the MDEQ.  At all times relevant hereto, Defendant Busch was acting individually and in his official capacity as District Supervisor, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

71.     Defendant PATRICK COOK ("Cook") is sued in his official capacity as a Water Treatment Specialist assigned to the Lansing Community Drinking Water Unit of the MDEQ.  At all times relevant hereto, Defendant Cook was acting individually and in his official capacity as a Water Treatment Specialist, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

72.     Defendant MICHAEL PRYSBY ("Prysby") is sued in his official capacity as the Engineer assigned to District 11 (Genesee County) of the MDEQ.  At all times relevant hereto, Defendant Prysby was acting individually and in his official capacity as Engineer, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

73.     Defendant BRADLEY WURFEL ("Wurfel) is sued in his official capacity as Director of Communications for MDEQ.  At all times relevant hereto, Defendant Wurfel was acting individually and in his official capacity as a Director of Communications for MDEQ, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

74.     Defendant DARNELL EARLEY ("Earley") is sued in his official capacity as the Emergency Financial Manager.  Defendant Early was appointed by Defendant Snyder, and served as Emergency Manager to the City of Flint from November 1, 2013 until January 12, 2015.  At all times relevant hereto, Defendant Earley was acting individually and in his official capacity as Emergency Manager, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

75.     Defendant GERALD AMBROSE ("Ambrose") is sued in his official capacity as the Emergency Financial Manager.  Defendant Ambrose was appointed by Defendant Snyder, and served as Emergency Manager to the City of Flint from January 13, 2015 until April 28, 2015.  At all times relevant hereto, Defendant

20

Ambrose was acting individually and in his official capacity as Emergency Manager, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

76.     Defendant DAYNE WALLING ("Walling") is sued in his official capacity as the Mayor of Flint.  Defendant Walling served as Mayor from August 4, 2009 until November 9, 2015.  At all times relevant hereto, Defendant Walling was acting individually and in his official capacity as a Mayor of Flint, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

77.      Defendant HOWARD CROFT ("Croft") is sued in his official capacity as Director of Public Works for the City of Flint.  At all times relevant hereto, Defendant Croft was acting individually and in his official capacity as a Director of Public Works for the City of Flint, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

78.     Defendant MICHAEL GLASGOW ("Glasgow") is sued in his official capacity as Utilities Administrator for the City of Flint.  At all times relevant hereto, Defendant Glasgow was acting individually and in his official capacity as Utilities Administrator for the City of Flint, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

79.     Defendant DAUGHERTY JOHNSON ("Johnson") is sued in his official capacity as Utilities Administrator for the City of Flint.  At all times relevant

21

hereto, Defendant Johnson was acting individually and in his official capacity as Utilities Administrator for the City of Flint, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

80.    Defendant CITY OF FLINT is sued as the owner and operator of the public water system that provides potable water to the residents of Flint.  At all times relevant hereto, Defendant City of Flint is sued for its participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

81.    Defendant LOCKWOOD, ANDREWS & NEWMAN, P.C. ("LAN PC") is a Michigan professional corporation with its principal place of business located at 1311 S. Linden Road, Suite B, Flint, Michigan 48532.  At all times relevant hereto, LAN PC held itself out to the world as a LOCKWOOD, ANDREWS & NEWMAN, INC. ("LAN Inc.") company.  Upon information and belief, LAN PC was incorporated in 2008 by LAN Inc. after it was retained by Defendants to conduct studies and reports of the feasibility of a new water supply for the City of Flint.  Upon information and belief, work and services provided by LAN PC were conducted at LAN Inc.'s Chicago, Illinois location.  At all times relevant hereto, Defendant LAN PC is being sued for its participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

82.    Defendant LAN Inc. is a Texas corporation with its principal place of business in Houston, Texas.  At all relevant times hereto, LAN Inc. conducted business in Genesee County through Defendant LAN PC, at 1311 S. Linden Road,

22

Suite B, Flint Michigan 48532.  At all times relevant hereto, Defendant LAN Inc. is being sued for its participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

83.    Defendant LEO A. DALY COMPANY ("LAD") is a Nebraska corporation with its principal place of business at 8600 Indian Hills Dr., Omaha, Nebraska 68114.  Upon information and belief, Defendant LAD is the owner of LAN Inc. and LAN PC.  At all times relevant hereto, Defendant LAD is being sued for its participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

## JURISDICTION AND VENUE

84.    This Court has subject matter jurisdiction over this civil action pursuant to the Safe Drinking Water Act, 42 U.S.C. § 300j-8(a) and the Lead and Copper Rule, 40 C.F.R. §§ 141.80-.91.

85.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, for cases concerning federal questions; 28 U.S.C. § 1343(a)(3) and (4), for civil rights actions; and 28 U.S.C. §§ 2201-2202, the Declaratory Judgment Act.

86.    Venue is proper in this Court because Plaintiffs' and Class Members' claims arose in this judicial district, in Flint, Genesee County, pursuant to 28 U.S.C. §§ 102, 1391(b).

## RELEVANT FACTS

87.    The City of Flint is the largest city in Genesee County Michigan, and is located 66 miles northwest of Detroit.  There are approximately 100,000 residents in Flint, making it the one of the largest cities in Michigan.

88.    Flint has experienced several financial emergencies over the past two decades, and recorded a total debt of nearly $30 million during its first declared financial emergency 2002.

89.    In 2011, Defendant Snyder declared a second financial emergency in Flint and appointed Michael Brown as emergency manager to control its financial situation, pursuant to Public Act 436.  Pursuant to Public Act 436, after a financial emergency is declared, the city is placed in state receivership, and the appointed emergency manager temporarily supplants the governing body and elected officials of the city.

90.    While in state receivership and under the control of emergency manager Michael Brown, Defendant City of Flint faced crucial decisions about the future of its drinking water supply.

91.    For over five decades, Flint purchased treated drinking water from the Detroit Water and Sewerage Department ("DWSD").

92.    In 2011, Defendants commissioned Defendants LAN PC, LAN Inc. and LAD (collectively the "LAN Defendants") to determine the feasibility of using the Flint River as the primary drinking water source for the City of Flint.  In July 2011,

24

the LAN Defendants published "*Analysis of the Flint River as a Permanent Water Supply for the City of Flint*" (the "2011 Feasibility Report").

93.    In response to rising water rates and a financial crisis, on March 25, 2013, the Flint City Council approved a resolution to leave the DWSD, and became a partner with the Karegnondi Water Authority ("KWA"), which was scheduled to become operational in 2016.

94.    The KWA is a newly formed municipal water supply system, which planned on constructing a direct water distribution pipeline (the "Huron Pipeline") from Lake Huron to several Michigan counties, including Genesee County, the county Flint is located.

95.    With the City of Flint's water supply contract set to expire in April 2014, the City faced a nearly two year gap in providing water to its residents.

96.    The Emergency Manager refused to negotiate a short-term contract with DWSD, and alternatively selected the Flint River as the interim primary drinking water source to be used until the Huron Pipeline was set to be completed.

97.    The use of the Flint River as a source of primary drinking water had been contemplated by the City, but the 2011 Feasibility Report by the LAN Defendants rejected use of the Flint River due to costs associated with updating the Flint Water Treatment Plant that would bring Flint River water into compliance with federal and state drinking water standards, which was estimated to be in the tens of millions of dollars.

25

98.     According to the 2011 Feasibility Report, the LAN Defendants indicated that the water from the Flint River was highly corrosive and could not be used without proper corrosion controls in place at the Flint Water Treatment Plant.

99.     Despite this study, the decision was made to provide Flint residents with insufficiently treated water from the Flint River.  The switch was set to begin by spring 2014.

100.    On April 16, 2013, Emergency Manager Ed Kurtz signed the contract to make the move to the KWA, and the DWSD provided notice of termination the next day.

101.    On or about June 26, 2013, Defendants retained the LAN Defendants under a professional services contract to bring the Flint Water Treatment Plant into full-time operational use, utilizing the Flint River as the primary drinking water source.

102.    The LAN Defendants were to design engineering improvements and upgrades to the Flint Water Treatment Plant, consistent with their 2011 Feasibility Report, including the installation of corrosion controls.

103.    On June 29, 2013, the LAN Defendants met with representatives of Flint, Genesee County Drain Commissioners Office and the MDEQ to discuss:

    a.  using the Flint River as a water source;
    b.  the ability to perform the necessary upgrades to the Flint Water Treatment Plant;
    c.  the ability to perform quality control;

    d.  the ability for Flint to provide water to Genesee County;

    e.  the ability to meet an April or May 2014 timeline; and

    f.  developing a cost analysis.

104.  According to incomplete meeting minutes, "the conversation was guided with focus on engineering, regulatory, and quality aspects…" of the items previously referenced and the following determinations were made:

    a.  the Flint River would be more difficult to treat, but was viable as a source;

    b.  it was possible to engineer and construct the upgrades needed for the treatment process;

    c.  it was possible to perform quality control "with support from LAN engineering which works with several water system around the state, quality control count be addressed[;]"

    d.  the Flint Water Treatment Plant did not have the capacity to treat and distribute sufficient water to meet the needs of Flint and Genesee County;

    e.  there were many obstacles to overcome, but completion by the April or May 2014 timeline was reachable;

    f.  the next steps were for LAN to present Flint with a proposal that would include engineering, procurement, and construction needs for the project along with cost estimates.

    g.  the ability to meet an April or May 2014 timeline; and

    h.  developing a cost analysis.

105.  Before the City of Flint began pumping Flint River water into resident's systems, the MDEQ was required under the Safe Drinking Water Act's Lead and Copper Rule, 40 CFR Part 141, Subpart I §§ 141.80-91 (the "Lead and Copper Rule" or "LCR"), to approve use of the Flint River as a new source of water for Flint's nearly 100,000 residents.

27

106.   In April 2014, Defendants addressed and discussed corrosion control optimization for lead, and it was determined that having more data was advisable before implementing an optimization method.

107.   Despite their knowledge of the corrosiveness of Flint River water, and the lack of corrosion controls and treatment in place, the switch was approved by MDEQ in April 2014.

108.   The LAN Defendants knew, if not recommended, that the Flint Water Treatment Plant would begin drawing water from the Flint River later that month that would not be treated with anti-corrosive measures, and that it would create a condition dangerous to the health and welfare of the community.

109.   The LAN Defendants failed to ensure that the upgraded Flint Water Treatment Plant would treat Flint River water with proper corrosion controls before it was released for consumption, which is contrary to water quality standards, the standard of care of similarly situated and experienced engineers, and common sense.

110.   Thereafter, on April 25, 2014, the City of Flint officially turned off the DWSD line and began pumping Flint River water into the Flint system

111.   Upon information and belief, Defendants knew of the 2011 Feasibility Report for the Flint River when the switch was made.

112.   Upon information and belief, Defendants knew that the necessary anti-corrosion controls (such as the use of phosphate) were not in place to treat the water at the Flint Water Treatment Plant.

28

113.   In the weeks and months after the switch to the Flint River was made, Flint water users, accustomed to decades of safe, clean and fresh water via DWSD, began noticing the water had at times been cloudy, discolored, and foul smelling.

114.   Dozens of residents reported unusual side effects such as hair loss, nausea, and skin rashes, after drinking or otherwise using the water in any residential capacity.

115.   After water samples tested positive for fecal coliform bacteria ("E.coli") in August and September 2014, Defendants issued three boil water advisories, urging residents to boil water not just for drinking, but for making ice, brushing teeth, washing dishes, and preparing food.

116.   In an attempt to combat the sudden presence of E.coli, Defendants began treating the Flint water supply with trihalomethanes ("TTHM"), a chlorine disinfectant byproduct that is intended to kill dangerous pathogens, but can also cause deadly health problems.

117.   The use of TTHM caused the City of Flint to violate federal standards under the Safe Drinking Water Act ("SDWA") for nearly eight months - from January 2015 until August 2015.  As a result of the violations, the City of Flint was required as a matter of federal law to send residents warning notices regarding the illegal TTHM levels.

118.   In an attempt to reduce TTHM levels, the City of Flint began adding ferric chloride, a coagulant used to improve the removal of organic matter.

29

119.   Within a few weeks of the issuance of the TTHM notice, Flint City Council members approached Emergency Manager Defendant Earley, demanding a reasonable response to the health risks, namely that the City of Flint should reconnect with Detroit water.  Defendant Earley refused to act as requested by members of the City Council.

120.   Defendants were on actual notice of the need to assess the factors contributing to the elevated TTHM levels following the switch to the Flint River.

121.   Despite these early warning signs of a potential water crisis, in October 2014, the MDEQ minimized the issue and blamed cold weather, aging pipes, and a declining population for the poor water quality Flint's residents were reporting.

122.   During the first half of 2015, Flint residents continuously expressed their concerns about water quality to Flint and MDEQ officials.

123.   Between July and December 2014, the City conducted the first of two rounds of six month lead sampling under the Lead and Copper Rule.

124.   The City conducted the second of two rounds of six month lead sampling under the Lead and Copper Rule between January and June 2015.  The two rounds of sampling showed that the levels of lead in the City's public water supply were rapidly rising.

125.   In January 2015, representatives of the DWSD offered to waive the $4 million reconnection fee in an effort to bring safe water to Flint's residents again. However, Defendant Early rejected this proposal.

30

126.   On January 13, 2015, Defendant Earley was replaced as Emergency Manager by Defendant Ambrose.  On January 29, 2015, DWSD again offered to reconnect Flint to the Detroit system.  However, Emergency Manager Ambrose rejected this offer, and continued to offer false assurances regarding the safety of Flint's water to the residents of Flint.

127.   In a February 3, 2015 internal memo prepared for Defendant Snyder, Defendants attempted to downplay the severity of the water crisis, stating - "It's clear the nature of the threat was communicated poorly.  It's also clear that folks in Flint are concerned about other aspects of their water – taste, smell, and color being among the top complaints."

128.   On or about April 24, 2015, MDEQ notified Region 5 of the Environmental Protection Agency ("EPA") that the City did not have appropriate corrosion control treatment in place at the Flint Water Treatment Plant.

### *Lead Contamination in Flint's Water Supply*

129.   As a result of the corrosivity of Flint River water, the lack of corrosion controls in place, and the decisions by Defendants, Plaintiffs have been exposed to deadly levels of lead in their water.

130.   The Center for Disease Control and Prevention has stated that "No safe blood level has been identified."

31

131.   Lead is introduced into drinking water when highly corrosive water is pumped through aging supply pipes, causing lead to be released from the pipes and into the faucets of users.

132.   In an effort to protect the drinking water supply, the EPA published the Lead and Copper Rule in 1991, setting operational standards for pipes, plumbing fittings, fixtures, and solder.

133.   Under the Lead and Copper Rule, water systems are required to monitor drinking water at customer taps.  If lead concentrations exceed an action level of 15 ppb in more than 10% of customer taps sampled, the system must undertake a number of additional actions to control corrosion, including treatment, monitoring the water, and educating the public about the presence of lead, the adverse health effects posed by lead, the measures being taken to ameliorate the problem, and what consumers can do to minimize their exposure to the lead.

134.   Defendants did not consider how to control the corrosive water from the Flint River before making the switch in 2014, despite having ample knowledge of the potential dangers from the 2011 Flint River Feasibility Report.

135.   At the time when the City of Flint began using Flint River water, there was no form of treatment to control corrosion.  Instead, Defendants waited until residents began complaining of water quality issues before any form of treatment control was implemented.

32

136.   Pursuant to the Lead and Copper Rule, the City of Flint was to conduct two six-month monitoring periods to test resident's tap water for the presence of lead.  The first period ran from June 2014 – December 2014, with the second covering January 2015 – June 2015.

137.   The purpose of this testing under the Lead and Copper Rule is to measure lead levels from a sample set of residential homes, to determine the corrosivity of the City of Flint's water, in an effort to limit exposure to the residents of Flint.

138.   Upon information and belief, improper testing methods were used in an attempt to ensure the average results of the 10% of tested homes remained below the 15 ppb federal action level enumerated under the Lead and Copper Rule.

139.   For example, the City of Flint instructed residents to "pre-flush" their taps before collecting the samples for the two six-month monitoring period.

140.   The practice of pre-flushing a tap minimizes the lead captured in the sample, and does not provide an accurate measurement of lead levels in the public drinking water.

141.   Upon information and belief, Defendants knew that Flint residents were being exposed to elevated levels of lead.  Moreover, Defendants knew that misleading and improperly conducted tests were providing false results and assurances to Flint's residents.

33

142.   On March 25, 2015, the Flint City Council voted to re-connect to DWSD, but Defendant Ambrose rejected this decision, and instead continued to provide toxic water to Flint's residents.

143.   In June of 2015, EPA representative Miguel A. Del Toral ("Toral") wrote an internal memo expressing his concerns with issues with water coming from the Flint River, and the lack of corrosion controls in place at the Flint Water Treatment Plant.  According to Toral's report, the absence of corrosion control treatment for mitigating lead and copper in the City of Flint's water system was a major public health concern.

144.   Pursuant to the Lead and Copper Rule, large water systems (i.e., those serving greater than 50,000 residents) such as those in the City of Flint, are required to install such corrosion control treatment.

145.   Independent investigations of the Flint water crisis were commenced by Professor Marc Edwards ("Professor Edwards") and other experts from Virginia Tech in 2015.

146.   During the summer of 2015, Professor Edwards and his team collected 277 water samples from the faucets of Flint residents, and found that 10% of the samples had lead levels of 25 parts per billion (ppb) - in excess of the federal action level of 15 ppb pursuant to the Lead and Copper Rule.

147.   Furthermore, independent investigations determined that the Flint River water was nearly 19 times more corrosive than the DWSD water Flint had been purchasing before the switch in April 2014.

148.   Despite the mounting evidence of a severe lead contamination problem as a result of the lack of corrosion control measures, Defendants continued to tell residents that Flint's water was safe for consumption.

149.   In August of 2015, Dr. Mona Hanna-Attisha MD ("Dr. Mona Hanna-Attisha") of Hurley Hospital released a report which showed a dramatic increase in Flint children with elevated lead levels in the blood.  The timing of this spike directly correlated with the time of exposure to the highly corrosive Flint River water beginning April 2014.

150.   According to Dr. Hanna-Attisha's findings, the number of Flint children under the age of 5 with elevated lead levels in their blood doubled after the switch, rising from 2.1% to 4.0%.  Moreover, blood test results of infants (15 months or less) showed an increase from 1.0% to 2.5%, post-switch.

151.   On October 1, 2015, Genesee County Health Officials issued a public health emergency urging Flint residents not to drink the tap water.

152.   On October 2, 2015, State officials announced that the State of Michigan would provide water filters to Flint water users in an attempt to minimize the water crisis.

153.   Flint's Technical Advisory Committee, a blue ribbon committee appointed to make recommendations aimed at improving the quality of Flint's water, recommended on October 7, 2015 that the City of Flint should make the switch back to the DWSD.

154.   On October 8, 2015, Defendant ordered the City of Flint to re-connect with the DWSD.

155.   On October 19, 2015, Defendant Wyant issued a statement regarding MDEQ's handling of the Flint water crisis:

> It recently has become clear that our drinking water program staff made a mistake while working with the City of Flint. Simply stated, staff employed a federal protocol they believed was appropriate, and it was not. The water testing steps followed would have been correct for a city less than 50,000 people, but not for a city of nearly 100,000.

156.   Defendant City of Flint attempted to rebuild the protective coating inside water transmission lines on December 9, 2015, by adding supplemental phosphate to the water.

157.   The failure to implement these additional corrosion controls, as required by the Lead and Copper Rule, contaminated Flint's public water supply with deadly amounts of lead, now damaging Plaintiffs and the Class.

158.   On December 14, 2015, Flint Mayor Karen W. Weaver declared a State of Emergency, pursuant to Michigan Emergency Act 390 of 1976.

159.   In her Declaration, Mayor Weaver stated "the City of Flint has experienced a Manmade disaster by switching to the use of the Flint River before

36

connecting to KWA…" and "the city of Flint children have experienced increased blood lead levels since the switch to the Flint River."

160.   The Flint Water Advisory Task Force, a team appointed by Defendant Snyder to review the Flint water crisis, released a report on December 29, 2015, placing the primary responsibility on what happened in Flint with MDEQ.  Shortly thereafter, Defendants Wyant and Wurfel resigned from their positions at MDEQ as Director and Department Spokesman, respectively.

161.   On January 5, 2016, Defendant Snyder declared a State of Emergency, stating "the damaged water infrastructure and leaching of lead into the city's water caused damage to public and private water infrastructure, and has either caused or threatened to cause elevated blood lead levels, especially in the population of children and pregnant women…"

162.   President Barack Obama declared a federal State of Emergency in the city of Flint on January 16, 2016, freeing up $5 million in federal aid to immediately assist with the public health crisis.

163.   Plaintiffs and the Class continue to be exposed to unsafe water, and will continue to be exposed, until the pipes and services lines that were damaged by the corrosive Flint River water are replaced.

164.   The presence of the contaminants on Plaintiffs' and Class Members' properties has resulted in permanent and continuing harm to their persons and properties.

37

165.   Due to the Defendants' negligent decisions explained of herein, Defendants' failure to avoid the release of contaminants into Flint's water supply, Defendants' failure to adequately warn Plaintiffs and the Class of the condition damaging their properties and impacting their health, and Defendants' failure to act reasonably in eliminating, correcting, and/or remediating the condition, Defendants, and each of them individually, were and are obligated to institute reasonable care and compensation plans to halt, prevent and correct injuries to all Plaintiffs and the Class, their physical and mental well-being, their real and personal property, and their economic interests.

166.   As residents of the City of Flint, Plaintiffs and the Class would be, and are foreseeably and unnecessarily injured by the Defendants' failure to warn and failure to exercise reasonable care to eliminate, correct, and/or remediate the dangerous condition created and/or maintained by Defendants.

167.   Defendants knowingly and negligently released or allowed to be released toxic contaminants into the environment, and/or continue to allow the migration of toxic chemicals into the environment on and around the properties owned by Plaintiffs and Class Members.

168.   Defendants intentionally and/or negligently failed to adequately warn or advise Plaintiffs and the Class as to the nature, extent, composition, effects, and location of the contamination, the fact that Plaintiffs and the Class, as well as their property, were being exposed to the contamination, the nature of the contaminants

and risks that could change over time, and that exposure to the contamination could likely cause life threatening and permanent adverse health effects.

169.   The numerous egregious actions and incidents occurring in the City of Flint caused by Defendants constitute an intentional and/or negligent breach of their duty of reasonable care, and blatant violations of federal and Michigan State law.

170.   Defendants, through their negligent and/or reckless acts, have repeatedly and unreasonably invaded each and every Plaintiff and Class Member's right to possession and undisturbed occupancy of their residences, and have repeatedly trespassed by causing migration of toxic contaminants onto the real properties of Plaintiffs and Class Members.

171.   Defendants, through their negligent and/or reckless acts, have caused continuing damage to the person of Plaintiffs and Class Members, as well as their real and personal properties, and have caused continuous injury to the land values of those holding real property due to devaluation resulting from negative publicity that has unfairly injured their competitive status in home equity and re-sale value in relation to real property owners similarly situated in areas outside of areas affected by the contamination.

172.   Plaintiffs and the Class have suffered and continue to suffer various types of injuries due to the acts of the Defendants as hereinbefore alleged.  Plaintiffs and the Class have, due to the acts of all the Defendants, suffered and continue to

suffer sudden, repeated and continual invasions of their rights of possession and to undisturbed occupancy of their residences and living areas.

173.   Due to the acts of the Defendants, Plaintiffs and the Class suffered and continue to suffer stigma damages and injury due to the creation of an unfair, competitive disadvantage by way of diminution of property value as compared with similarly situated unaffected real property.  This injury has resulted, in part, from the numerous public interest reports in the printed press concerning the contamination.

174.   Plaintiffs and the Class have, due to the destructive acts of each of the Defendants, suffered and continue to suffer from the general diminution in the aesthetic qualities of their homes and the area in which they reside, caused by the total compounded effect of all of the above-described circumstances.

175.   In order to compensate Plaintiffs and the Class for damages suffered due to Defendants' acts, each Plaintiff and Class Member requires, among other things, that Defendants, and each of them, pay the past and future costs of obtaining necessary medical care, toxicological examinations and diagnoses, and any other medical monitoring necessary in order to ascertain and treat the nature and extent of injuries suffered due to the contamination emanated from the contamination, with Plaintiffs and the Class retaining freedom of choice relative to choosing their experts.  Many of these costs would not be covered by health care insurers, and, even if covered, may unfairly result in increased premiums.

40

176.   Furthermore, Plaintiffs and the Class seek compensation for: the diminution in the economic value of their personal and real property; residential water testing and monitoring; cleanup, removal and remediation of any and all contamination of their properties, including the costs of investigation and testing of the properties; repairs to real property damaged by Defendants; other damages; and attorneys' fees and costs as allowed by law, and any other compensation this court deems just.

177.   Furthermore, Plaintiffs and the Class seek injunctive relief as allowed by law and required by justice, including, but not limited to, an order compelling Defendants to take specific actions to cleanup, remediate, and/or correct the contamination, and any other action this court deems just.

### *Fear of Cancer*

178.   Plaintiffs and the Class have a justifiable and actual fear of developing cancer as a result of said exposure.  With reasonable probability, the prospective, feared, and anticipated consequences may be expected to flow from the past harm.

179.   Plaintiffs and the Class will incur future expenses for medical monitoring and, as a result, seek payment of their related medical expenses as an element of the consequential damages.

180.   The degree of probability that the Plaintiffs and the Class will develop cancers is such that there is a reasonable certainty that such cancers will develop at

41

some future date, thus entitling plaintiffs to recover from Defendants for apprehended consequences that are not presently manifested.

181.   A rational basis exists between the exposure to the above-described toxins and contaminants, and Plaintiffs' and Class Members' currently manifested fear of developing cancer in the future.

### *Medical Monitoring*

182.   As a direct and proximate result of the Defendants' acts, omissions, and conduct as set forth in this Complaint, Plaintiffs and the Class have suffered and continue to suffer a significantly increased risk of contracting a serious injury or latent disease, including, but not limited to, several forms of cancer, respiratory ailments, gastrointestinal ailments, sleep disturbance, and physical stress.  This increased risk makes periodic diagnostic medical examinations reasonably necessary to establish a "baseline" status of their health and to monitor their status for changes and progressions in their injuries and their sequelae.

183.   Early detection and diagnosis of these diseases is clinically invaluable as early detection and diagnosis can prevent, reduce, and/or significantly delay resulting discomfort, suffering, disability, and dysfunction, and/or death. Furthermore, these conditions can often appear asymptomatic absent proper testing until they have progressed to an untreatable, permanent, and/or terminal state.

184.   Easily administered, cost-effective monitoring and testing procedures exist that make the early detection and treatment of such injuries or diseases possible

42

and beneficial.  For example, administration of these readily available non-invasive tests can easily and accurately diagnose the presence of liver failure, respiratory ailments, and heart dysfunction, even in asymptomatic individuals.  Early diagnosis of these diseases and conditions will allow prompt and effective treatment and will reduce the risk of morbidity, and mortality, from which these Plaintiffs and the Class would suffer if diagnosis and/or treatment were delayed until their conditions became overtly symptomatic.

185.   The recommended testing procedures will be subject to expert testimony at the time of trial.

186.   Plaintiffs and the Class are at a high risk for latent and progressive respiratory injuries and therefore need to undergo testing.  Plaintiffs and the Class also need the availability of non-invasive testing as a diagnostic tool and method of treatment in order to prevent untreated and unabated progression of latent injuries, which will result in even more grave injuries and consequences.

187.   The Plaintiffs and Class Members increased susceptibility to certain injuries and the irreparable threat to the their future health and well-being resulting from their exposure to hazardous substances and chemicals in and around their homes, schools, businesses and other public places in the City of Flint can only be mitigated and/or addressed by the creation of a medical program including but not limited to:

a. notifying Plaintiffs and the Class of the potential harm from exposure to the contamination described herein;

b. funding further studies of the long-term effects of exposure;

c. funding research into possible cures for the detrimental effects of breathing, living and working near the contaminants and toxicants present in the City of Flint as a result of the acts and omissions alleged herein;

d. gathering and forwarding to their treating physicians information related to the diagnosis and treatment of injuries which result from their exposure(s) in and around the City of Flint; and

e. aiding in the early diagnosis and treatment of resulting injuries through ongoing testing and monitoring of Plaintiffs and the Class.

188.   To the extent that Defendants' actions resulted in the discharge and/or release of toxic contaminants into Flint's drinking water, thereby entering and injuring the physical and mental well-being of Plaintiffs and the Class, their real and personal property, and their economic interests, Defendants are jointly and severally liable for all damages from contamination in this case.

## **CLASS ACTION ALLEGATIONS**

188.   Plaintiffs bring this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and similarly situated individuals in the City of Flint, Michigan, subject to amendment and additional discovery as follows:

a. all persons in the City of Flint who have been harmed by Defendants' continuing violation of the Safe Drinking Water Act's requirement to operate and maintain optimal corrosion control treatment, 40 C.F.R. §§ 141.81-.82;

b. all persons in the City of Flint who have been harmed by Defendants' continuing violation of the Safe Drinking Water Act's requirement to

44

notify customers of the individual results of tap water samples tested
for lead within 30 days after receiving the results, 40 C.F.R. §
141.85(d)(1), (d)(2);

c. all persons in the City of Flint who have tested positive for the presence
of lead in their blood, since April 25, 2014;

d. all persons in the City of Flint who have experienced personal injury as
a result of their exposure to elevated lead levels in Flint's drinking
water supply, since April 25, 2014; and

e. all persons in the City of Flint who have owned  property in Flint
Michigan since April 25, 2014.

189.   Excluded from the Class is:

a. Defendants, including any entity or division in which Defendants have
a controlling interest, along with their legal representative, employees,
officers, directors, assigns, heirs, successors, and wholly or partly
owned subsidiaries or affiliates;

b. the Judge to whom this case is assigned, the Judge's staff, and the
Judge's immediate family; and

c. all governmental entities.

190.   Plaintiffs reserve the right to amend the Class definition if discovery

and further investigation reveal that any Class should be expanded, divided into

additional subclasses, or modified in any other way.

## NUMEROSITY AND ASCERTAINABILITY

191.   This action meets the numerosity requirement of Fed. R. Civ. P.

23(a)(1), given that the amount of affected Flint residents and property owners, upon

information and belief, has reached the tens of thousands, making individual joinder

of class members' respective claims impracticable. While the precise number of

class members is not yet known, the precise number can be ascertained from U.S.

Federal Census records, State of Michigan and City of Flint public records, and

through other discovery.  Finally, Class members can be notified of the pendency of this action by Court-approved notice methods.

## TYPICALITY

192.   Pursuant to Federal Rules of Civil Procedure 23(a)(3), Plaintiffs' claims are typical of the claims of class members, and arise from the same course of conduct by Defendants.  Plaintiffs' persons and real property, like all Class Members, has been damaged by Defendants' misconduct in that they have incurred damages and losses related to the introduction of highly corrosive water from the Flint River into the public water supply, causing lead contamination and personal injury damages, destroying the lead supply pipes, and causing the ongoing water crisis in Flint.  Furthermore, the factual bases of Defendants' actions and misconduct are common to all Class Members and represent a common thread of misconduct resulting in common injury to all Class Members.  The relief Plaintiffs seek is typical of the relief sought for absent Class Members.

## ADEQUACY OF REPRESENTATION

193.   Plaintiffs will serve as fair and adequate class representatives as their interests, as well as the interests of their counsel, do not conflict with the interest of other members of the class they seek to represent.  Further, Plaintiffs have retained counsel competent and experienced in class action litigation.

194.   Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class.

## PREDOMINANCE OF COMMON ISSUES

195.    There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members.  These common legal and factual issues include the following:

a.  whether Defendants engaged in the conduct alleged herein;

b.  whether optimal corrosion control treatment was identified and implemented, as required by the Safe Drinking Water Act and the Lead and Copper Rule, pursuant to 40 C.F.R. § 141.81(d)(4), since April 25, 2014, when the switch to the Flint River was made;

c.  whether Defendants "continued to operate and maintain optimal corrosion control treatment", as required by the Safe Drinking Water Act and the Lead and Copper Rule, pursuant to 40 C.F.R. §141.82(g);

d.  the extent to which Defendants know about the lead contamination of the Flint water supply after April 2014 and before notifying Plaintiffs and Class Members;

e.  whether Defendants' conduct violates the Safe Drinking Water Act, the Constitution of the United States, and other laws as set forth herein;

f.  whether Defendants made unlawful and misleading representations or material omissions with respect to the safety of Flint's water supply; and

g.  whether Plaintiff and Class Members are entitled to damages and other monetary relief, including punitive damages, and if so, in what amount.

## SUPERIORITY

196.    The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case.  Further, no unusual difficulties are likely to be encountered in the management of this class action.  Given the great amount of Flint residents impacted by Defendants' conduct, it is impracticable for

47

Plaintiffs and the Class to individually litigate their respective claims for Defendants' complained of conduct.  To do so would risk inconsistent or contradictory judgments and increase delays and expense to both parties and the court system.  Therefore, the class action mechanism presents considerably less management challenges and provides the efficiency of a single adjudication and comprehensive oversight by a single court.

## DECLARATORY AND INJUNCTIVE RELIEF

197.   Since Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and Class Members, final injunctive and declaratory relief is appropriate with respect to the Class as a whole

### AS AND FOR A FIRST CAUSE OF ACTION:
### VIOLATION OF SAFE DRINKING WATER ACT'S
### NOTIFICATION REQUIREMENTS, 40 C.F.R. § 141.85

198.   Plaintiffs and the Class hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 though 197 as if fully restated herein.

199.   Defendants were given written notice of this violation of the Safe Drinking Water Act pursuant to 42 U.S.C. § 300j-8(b) on November 16, 2015, by the Concerned Pastors for Social Action, Melissa Mays, the American Civil Liberties Union of Michigan, and the Natural Resources Defense Council.

200.   Defendant City of Flint owns and operates a "public water system" pursuant to the Safe Drinking Water Act.  42 U.S.C. § 300(f); 40 C.F.R. §141.2.

48

201.   Since April 24, 2015, Defendants have violated and continue to violate the Safe Drinking Water Act by failing to comply with the requirement that water systems notify customers of the individual results of tap water samples collected and tested for lead within thirty days after the water system receives the results.  40 C.F.R. § 141.85(d)(1),(d)(2).

202.   For all monitoring conducted since the switch to the Flint River was made on April 24, 2015, Defendants have failed to notify Plaintiffs, the Class and those residing at each sampling site of the presence of elevate lead levels in the public water supply.

## AS AND FOR A SECOND CAUSE OF ACTION: VIOLATION OF SAFE DRINKING WATER ACT'S REQUIREMENT TO OPERATE OPTIMAL CORROISON CONTROL TREATMENT, 40 C.F.R. § 141.81-.82

203.   Plaintiffs and the Class hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 though 202 as if fully restated herein.

204.   Defendants were given written notice of this violation of the Safe Drinking Water Act pursuant to 42 U.S.C. § 300j-8(b) on November 16, 2015, by the Concerned Pastors for Social Action, Melissa Mays, the American Civil Liberties Union of Michigan, and the Natural Resources Defense Council.

205.   Defendant City of Flint owns and operates a "public water system" pursuant to the Safe Drinking Water Act.  42 U.S.C. § 300(f); 40 C.F.R. §141.2.

49

206.   Since the switch to the Flint River was made on April 24, 2015, Defendants have violated and continue to violate the Safe Drinking Water Act by failing to operate and maintain optimal corrosion control treatment.  40 C.F.R. § 141.82(g).

207.   Defendants have failed to maintain optimal corrosion control treatment because it did not treat the water being sold to Flint residents with corrosion-inhibiting chemicals to minimize the amount of lead leaching into the public water supply.

208.   The absence of optimal corrosion control treatment caused and continues to cause dangerous amounts of lead to enter the public water supply relied upon by Plaintiffs and the Class.

**AS AND FOR A THIRD CAUSE OF ACTION:**
**VIOLATION OF 42 U.S.C. § 1983**
**SUBSTANTIVE DUE PROCESS – STATE CREATED DANGER**
**(as against all Defendants)**

209.   Plaintiffs and the Class hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 though 208 as if fully restated herein.

210.   42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

50

211.   Plaintiffs and the Class in this action are citizens of the United States and all of the Defendants are persons for purposes of 42 U.S.C. § 1983.

212.   All Defendants, at all times relevant hereto, were acting under the color of law in their individual and official capacity as State and City officials, and their acts and/or omissions were conducted within the scope of their official duties and employment.

213.   Plaintiffs and the Class herein, at all times relevant hereto, have a clearly established Constitutional right under the Fourteenth Amendment, such that the state may not deprive a person of life, liberty or property without due process of law.

214.   Defendants' actions and omissions with regard to the switch to the Flint River, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them, and therefore violated the Fourteenth Amendment rights of Plaintiffs and the Class.

215.   Defendants' actions and omissions with regard to the switch to the Flint River, as described herein, were also malicious and/or involved reckless, callous, and deliberate indifference to Plaintiffs' and Class Members' federally protected rights.  These actions and omissions shock the conscience and violated the Fourteenth Amendment rights of Plaintiffs and the Class.

216.   Defendants engaged in the conduct described herein, willfully, maliciously, in bad faith, and in reckless disregard to Plaintiffs' and Class Members' protected constitutional rights.

217.   They did so with shocking and willful indifference to Plaintiffs' and Class Members' rights and their conscious awareness that they would cause Plaintiffs and the Class severe physical and emotional injuries.

218.   As a proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered actual physical and emotional injuries, and other damages and losses as described herein entitling them to compensatory and special damages, in amounts to be determined at trial.  As a further result of Defendants' unlawful conduct, Plaintiffs and the Class have incurred special damages, including medically related expenses and may continue to incur further medically and other special damages related expenses, in amounts to be established at trial.

219.   Plaintiffs and the Class are entitled to an award of non-economic damages in the nature of pain and suffering, embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms such as sleepiness, gastro-intestinal discomfort, neuropathy and similar symptoms.

220.   Plaintiffs and the Class have experienced property damage to their homes in the nature of lost property value and seek damages to remediate the permanent damage caused by the use of corrosive water without proper anti-corrosive treatment.

52

221.   In addition to compensatory, economic, consequential and special damages, Plaintiffs and the Class are entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that actions of each of these Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiffs and the Class.

### AS AND FOR A FOURTH CAUSE OF ACTION: VIOLATION OF 42 U.S.C. § 1983 SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY (as against all Defendants)

222.   Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 though 221 as if fully restated herein.

223.   42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

224.   Plaintiffs and the Class in this action are citizens of the United States and all of the Defendants are persons for purposes of 42 U.S.C. § 1983.

225.   All Defendants, at all times relevant hereto, were acting under the color of law in their individual and official capacity as State and City officials, and their acts and/or omissions were conducted within the scope of their official duties and employment.

226.   Plaintiffs and the Class herein, at all times relevant hereto, have a clearly established Constitutional right under the Fourteenth Amendment, such that a person has a right to bodily integrity.

227.   Defendants violated Plaintiffs' and the Class Members' right to bodily integrity, insofar as Defendants failed to protect Plaintiffs and the Class from a foreseeable risk of harm from the lead contaminated water.

228.   Defendants knew of the deadly and irreversible medical consequences associated with lead contamination, and their duty to ensure that lead levels in the public water supply remained below the action level enumerated in the Lead and Copper Rule.

229.   As a result of Defendants failure to protect Plaintiffs, the Class and the Flint drinking water supply from the lead contamination, Plaintiffs and the Class have suffered bodily harm from their exposure to contaminated water.

230.   Defendants' actions and omissions with regard to the switch to the Flint River, as described herein, were malicious and/or involved reckless, callous, and deliberate indifference to Plaintiffs' and Class Members' federally protected rights. These actions and omissions shock the conscience and violated the Fourteenth Amendment rights of Plaintiffs and the Class.

231.   Defendants engaged in the conduct described herein, willfully, maliciously, in bad faith, and in reckless disregard to Plaintiffs' and Class Members' protected constitutional rights.

232.   They did so with shocking and willful indifference to Plaintiffs' and Class Members' rights and their conscious awareness that they would cause them severe physical and emotional injuries.

233.   As proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered actual physical and emotional injuries, and other damages and losses as described herein entitling them to compensatory and special damages, in amounts to be determined at trial.  As a further result of Defendants' unlawful conduct, Plaintiffs and the Class have incurred special damages, including medically related expenses and may continue to incur further medically and other special damages related expenses, in amounts to be established at trial.

234.   Plaintiffs and the Class are entitled to an award of non-economic damages in the nature of pain and suffering, embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms such as sleepiness, gastro-intestinal discomfort, neuropathy and similar symptoms.

235.   Plaintiffs and the Class have experienced property damage to their homes in the nature of lost property value and seek damages to remediate the permanent damage caused by the use of corrosive water without proper anti-corrosive treatment.

236.   In addition to compensatory, economic, consequential and special damages, Plaintiffs and the Class are entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that actions of each of

55

these Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiffs.

## AS AND FOR A FIFTH CAUSE OF ACTION:
### NEGLIGENCE
### (as against all Defendants)

237.   Plaintiffs and the Class hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 though 236 as if fully restated herein.

238.   Defendants, and each of them, breached their duty of reasonable care which a reasonably prudent person should use under the circumstances, by allowing contaminants to be released into the drinking water of the City of Flint, including but not limited to lead.

239.   Defendants, and each of them, as owner and operator of a Flint water supply that provided its residents with usable water, owed Plaintiffs and the Class a cognizable duty to exercise reasonable care in providing Plaintiffs and the Class with safe drinking water and the maintenance of their tools and equipment used for such acts.

240.   Defendants, and each of them, negligently, gross negligently, recklessly, willfully, wantonly, and/or intentionally created the immediate and continuing contamination of drinking water in and around the real property of Plaintiffs and Class Members.

241.   Upon learning of the release of the contaminants, Defendants owed Plaintiffs and the Class a duty to act reasonably to remediate, contain, and eliminate

56

the contamination before it injured Plaintiffs, the Class and their property and/or to act reasonably to minimize the damage to Plaintiffs, the Class and their property.

242.   Defendants breached that duty by failing to act reasonably in providing Plaintiffs and the Class usable water.  Furthermore, Defendants failed to take reasonable, adequate and sufficient steps or action to eliminate, correct, or remedy any contamination after they occurred.

243.   Defendants breached that duty by failing to timely notify the Plaintiffs and the Class of the contamination of Flint's drinking water, and, consequently, the presence of lead and other contaminants in the homes and rental properties of Plaintiffs and Class Members.

244.   As a result of Defendants' breaches of their duty to timely notify, Plaintiffs and the Class were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs and the Class have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

245.   Defendants negligently breached their duties to the Plaintiffs and the Class to ensure that the Flint water supply was safe and sufficiently secure as to prevent the release of the contaminants into the water facilities and, consequently, the homes and rental properties of Plaintiffs and Class Members.

57

246. Defendants willfully and wantonly breached their legal duty to properly remediate the contamination despite full knowledge of the extent of the contamination and the threat it poses to human health and safety.

247. Defendants' breaches of their duties were direct and proximate causes of Plaintiffs' and Class Members' damages and the imminent, substantial and impending harm to their homes, rental properties and health.

248. Defendants owed each and every one of these Plaintiffs and the Class a duty to warn that the aforementioned contamination of Flint's water supply might occur.

249. Defendants breached that duty by failing to warn the Plaintiffs and the Class of the likelihood of lead and other toxic chemicals contaminating the Flint water supply, and, consequently, the homes and rental properties of Plaintiffs and Class Members.

250. As a result of Defendants' breaches of their duty to warn, Plaintiffs and the Class were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

251. Plaintiffs and the Class suffered foreseeable injuries and damages as a proximate result of said Defendants' negligent breach of their duties as set forth above. At the time Defendants breached their duties to Plaintiffs and the Class,

58

Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiffs and the Class so apparent as to entitle them to be protected against such actions or inactions.

252.   Accordingly, Plaintiffs and the Class seek damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs and the Class to their original position, including, but not limited to the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injuries to persons, and consequential damages flowing from the negligence which are the natural and proximate result of Defendants conduct in an amount to be proved at trial.

### AS AND FOR A SIXTH CAUSE OF ACTION:
### NUISANCE
### (as against all Defendants)

253.   Plaintiffs and the Class hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 though 252 as if fully restated herein.

254.   Defendants' wrongful actions in the creation of the contamination, maintenance of their land and water facilities, and failure to reasonably abate, minimize and/or remediate the contamination resulted in the presence of the contaminants in the persons and/or on properties of Plaintiffs and the Class, the creation of noxious odors, and the risk of injuries, and/or annoys Plaintiffs and the

59

Class in their enjoyment of their legal rights and quality of life. Such conditions constitute an ongoing specific, particular and unique burden on the persons of Plaintiffs and Class Members and their property.

255.   Such wrongful acts by Defendants in the maintenance and use of their land and water facilities and the failure to remediate the contamination was and is a foreseeable and proximate cause of injury, discomfort, annoyance, inconvenience, and/or damage to Plaintiffs, the Class and their property.

256.   Defendants' conduct is the legal cause of the intentional, unreasonable, negligent, and/or reckless invasion of Plaintiffs' and Class Members' interests in the private use and enjoyment of their land. Such actions' tendency is to create danger and inflict injury upon person and property.

257.   Defendants' conduct in performing acts or failing to act has caused one or more substantial, unreasonable, and intentional interferences with the right of Plaintiffs and Class Members to use and enjoy their property as discussed above.

258.   Accordingly, Plaintiffs and the Class seek general damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses and to restore Plaintiffs and the Class to their original position, including, but not limited to the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons, and direct and consequential damages

flowing from the nuisance and trespass which are the natural and proximate result of Defendants' conduct in an amount to be proved at trial.

## AS AND FOR A SEVENTH CAUSE OF ACTION:
## TRESPASS
### (as against all Defendants)

259.   Plaintiffs and the Class hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 though 258 as if fully restated herein.

260.   Defendants' negligent, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of contaminants to be released into the drinking water for the City of Flint.

261.   Defendants' willful, wanton, and intentional failure to act and/or their affirmative choice of action and following course of action caused the contaminants to enter and trespass upon the land and realty of the Plaintiffs and the Class and cause an injury to their possession and/or right of possession.

262.   Upon information and belief, Defendants had exclusive control over the facilities providing Plaintiffs and the Class water at all relevant times.

263.   Defendants took affirmative, voluntary, and intentional actions to provide water to Plaintiffs and the Class in an unsafe manner and/or intentionally to release contaminants into Flint's water supply.  Further, after such acts, Defendants undertook affirmative, voluntary, and intentional acts that were insufficient to remedy the condition caused by the release of the contaminants into the water supply.

61

264.   At the time that the above described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants had good reason to know or expect that highly corrosive water would cause large quantities of contaminants to be introduced into the persons and properties of Plaintiffs and Class Members.

265.   The above-described affirmative, voluntary, and intentional acts were performed with the willful intent to cause the contaminants to be disbursed through the water onto the land and property of Plaintiffs and the Class.

266.   These voluntary actions resulted in the immediate and continued trespass, injury and damage to Plaintiffs and the Class, their property and their right of possession of their property.

267.   Further, Defendants' actions in directing the contaminated water into the persons and properties of Plaintiffs and the Class were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiffs' rights, health and property.

268.   Additionally and/or alternatively, Defendants' decision to delay and the resulting delay in taking any affirmative action to eliminate, correct, and/or remedy the contamination of the water supply after having knowledge and notice of said contamination were done with actual malice, and in wanton and willful and/or reckless disregard for the rights, health and property of Plaintiffs and Class Members.

269.   Further, Defendants' actions that were patently insufficient to eliminate, correct, and/or remedy the contamination after having knowledge and notice of said contamination were made with actual malice and in wanton and willful and/or reckless disregard for the rights, health and property of Plaintiffs and Class Members.

270.   Based upon the above, Plaintiffs and the Class seek general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses, and to restore Plaintiffs and the Class to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons, consequential damages flowing from the trespass which are the natural and proximate result of Defendants conduct, and exemplary or punitive damages.

### AS AND FOR AN EIGHTH CAUSE OF ACTION:
### STRICT LIABILITY
### (as against Defendant CITY OF FLINT)

271.   Plaintiffs and the Class hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 though 270 as if fully restated herein.

272.   The drinking water provided by Defendant City of Flint was, at all relevant times, an unreasonably dangerous and defective product when used for its advertised and intended purpose.

63

273.   Defendant City of Flint knew, or should have known, that Plaintiffs and the Class could not realize and could not detect the dangerous and harmful nature of Flint's drinking water, and were in no position to implement any form of corrosion control measures.

274.   Defendant City of Flint should have, but did not, provide clear warnings as to the dangers associated with its drinking water.

275.   As a result of Defendant City of Flint's marketing and promotion of said defective and unreasonably dangerous drinking water, Plaintiffs and the Class were unreasonably exposed to toxic drinking water and have suffered injuries, losses and damages.

276.   By reason of having marketed and promoted its drinking water in its defective and unreasonably dangerous condition, Defendant City of Flint is strictly liable to Plaintiffs and the Class.

**AS AND FOR A NINTH CAUSE OF ACTION:**
**MEDICAL MONITORING**
**(as against all Defendants)**

277.   Plaintiffs and the Class hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 though 276 as if fully restated herein.

278.   At all relevant times herein, Defendants owed a duty to Plaintiffs and the Class to ensure the adequate processing, transportation, and storage of potable drinking water to the residents of the City of Flint.

64

279.   The significantly increased risks associated with exposure to these hazardous and toxic contaminants, including but not limited to lead, make periodic diagnostic medical examinations reasonable and necessary.

280.   Easily administered, cost effective tests are in existence, such that an available medical monitoring program is reasonable and necessary for continued monitoring of diagnosed conditions as well as for early detection of yet to be diagnosed injuries.

281.   The reasonableness and necessity of a medical monitoring program is supported by scientific principles, medical literature, and expert opinion.

282.   As a direct and proximate result of Defendants' reckless, negligent and grossly negligent operations and actions, as set forth herein, Plaintiffs and the Class have been exposed to potentially lethal doses of hazardous and toxic contaminants, and, as a result, suffer a significantly increased risk of death, further surgery, or other serious health complication.  This increased risk makes periodic diagnostic and medical examinations reasonable and necessary.  Easily administered, cost effective monitoring and testing procedures exist which make the early detection and treatment of such injuries or disease possible and beneficial.

### AS AND FOR A TENTH CAUSE OF ACTION:
### GROSS NEGLIGENCE
### (as against the Governmental Defendants)

283.   Plaintiffs and the Class hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 through 282.

284.   At relevant times, Defendants engaged in providing governmental functions to Plaintiffs and the Class.

285.   Defendants demonstrated substantial lack of concern as to whether injury would result to Plaintiffs and the Class by allowing contaminants to be released into the drinking water of the City of Flint, including, but not limited to, lead.

286.   Defendants, and each of them, as owner and operator of the Flint water supply that provided its residents with usable water, owed Plaintiffs and the Class a cognizable duty to exercise reasonable care in providing and selling safe drinking water and the maintenance of their tools and equipment used for such acts.

287.   Defendants, and each of them, negligently, gross negligently, recklessly, willfully, wantonly, and/or intentionally created the immediate and continuing contamination of drinking water in and around the real property of Plaintiffs and the Class.

288.   Upon learning of the release of the contaminants, Defendants owed Plaintiffs and the Class a duty to act reasonably to remediate, contain, and eliminate the contamination before it injured Plaintiffs, the Class and their property and/or to act reasonably to minimize the damage to their property.

289.   Defendants breached that duty by failing to act reasonably in providing and selling Plaintiffs and the Class usable water.  Furthermore, Defendants failed to

take reasonable, adequate and sufficient steps or action to eliminate, correct, or remedy any contamination after they occurred.

290.   Defendants breached that duty by failing to timely notify the Plaintiffs and the Class of the contamination of Flint's drinking water, and, consequently, the presence of lead and other contaminants in their homes and rental properties.

291.   As a result of Defendants' breaches of their duty to timely notify, Plaintiffs and the Class were forestalled from undertaking effective and immediate remedial measures, and have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

292.   Defendants breached their duties in a grossly negligent manner to the Plaintiffs and the Class to ensure that the Flint water supply was safe and sufficiently secure as to prevent the release of the contaminants into the water facilities and, consequently, the homes and rental properties of Plaintiffs and Class Members.

293.   Defendants willfully and wantonly breached their legal duty to properly remediate the contamination despite full knowledge of the extent of the contamination and the threat it poses to human health and safety.

294.   Defendants' breaches of their duties were direct and proximate causes of Plaintiffs' and Class Members' damages and the imminent, substantial and

impending harm to the homes, rental properties and health of Plaintiffs and Class Members.

295.   Defendants owed each and every one of these Plaintiffs and Class Members  a duty to warn that the aforementioned contamination of Flint's water supply might occur.

296.   Defendants breached that duty by failing to warn the Plaintiffs and the Class of the likelihood of lead and other toxic chemicals contaminating the Flint water supply, and, consequently, their homes and rental properties.

297.   Defendants demonstrated deliberate and/or intentional indifference to the public safety needs of Plaintiffs in violation of their rights under the U.S. Constitution, Michigan Constitutions, and Michigan Statutory and Common Law.

298.   Defendants' actions constituted a willful disregard of precautions and/or measures to attend to safety and a singular disregard for substantial risks.

299.   As a result of Defendants' breaches of their duty to warn of the contaminated water supply, the Plaintiffs and the Class were forestalled from undertaking effective and immediate remedial measures, and have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' gross negligence for many years into the future.

300.   Plaintiffs and the Class suffered foreseeable injuries and damages as a proximate result of said Defendants' grossly negligent breach of their duties as set forth above.  At the time Defendants breached their duties to, Defendants' acts

68

and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiffs and the Class so apparent as to entitle them to be protected against such actions or inactions.

301. The aforementioned conduct of Defendants constituted "gross negligence" in avoidance of governmental immunity.

302. The performance of governmental functions constituting gross negligence falls within the exceptions of governmental immunity pursuant to MCL 691.1407.

303. This Complaint is being plead in avoidance of governmental immunity.

304. The Defendants' defense of governmental immunity is voidable due to the gross negligence exception and all other relevant exceptions.

305. As a direct and proximate result of Defendants' reckless, negligent and grossly negligent operations and actions, as set forth herein, Plaintiffs and the Class have been exposed to potentially lethal doses of hazardous and toxic contaminants, and, as a result, suffer a significantly increased risk of death, further surgery, or other serious health complication. This increased risk makes periodic diagnostic and medical examinations reasonable and necessary. Easily administered, cost effective monitoring and testing procedures exist which make the early detection and treatment of such injuries or disease possible and beneficial.

306. Accordingly, Plaintiffs and the Class seek damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a

sufficient amount to compensate them for the injuries and losses sustained and to

restore Plaintiffs and the Class to their original position, including, but not limited to

the difference between the current value of their properties and such value if the

harm had not been done, the cost of repair or restoration, the value of the use of the

continuous trespass, injuries to persons, and consequential damages flowing from

the trespass which are the natural and proximate result of Defendants conduct in an

amount to be proved at trial.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION: PROPRIETARY FUNCTION (as against the Governmental Defendants)

307.   Plaintiffs and the Class hereby repeat, reallege, and reiterate each and

every allegation in the paragraphs numbered 1 through 306.

308.   At relevant times, Defendants engaged in proprietary functions,

specifically, the sale of potable water to Plaintiffs and the Class.

309.   Defendants' primary purpose in the aforementioned facts was to

produce a pecuniary profit for the governmental agency.

310.   The relevant activities are not normally supported by taxes and fees.

311.   The conduct of Defendants constituted "proprietary function" in

avoidance of governmental immunity.

312.   The performance of governmental functions constituting proprietary function falls within the exceptions of governmental immunity pursuant to MCL 691.1413.

313.   Defendants demonstrated deliberate and/or intentional indifference to the public safety needs of Plaintiffs and the Class in violation of their rights under the U.S. Constitution, Michigan Constitutions, and Michigan Statutory and Common Law during the exercise of proprietary functions.

314.   This Complaint is being plead in avoidance of governmental immunity.

315.   The Defendants' defense of governmental immunity is voidable due to the proprietary function exception and all other relevant exceptions.

316.   As a direct and proximate result of Defendants' reckless, negligent and grossly negligent operations and actions, as set forth herein, Plaintiffs and the Class have been exposed to potentially lethal doses of hazardous and toxic contaminants, and, as a result, suffer a significantly increased risk of death, further surgery, or other serious health complications.  This increased risk makes periodic diagnostic and medical examinations reasonable and necessary.  Easily administered, cost effective monitoring and testing procedures exist which make the early detection and treatment of such injuries or disease possible and beneficial.

## AS AND FOR A TWELFTH CAUSE OF ACTION:
### PROFESSIONAL NEGLIGENCE
#### (as against the LAN Defendants)

71

317.    Plaintiffs and the Class hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 through 316.

318.    The LAN Defendants, and each of them, breached their duty to exercise that degree of care consistent with the greater degree of knowledge and skill possessed by design professionals, as well as an ethical duty to report to public authorities the dangers posed to public health and property that would result from the failure to install and/or operate a proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

319.    The LAN Defendants, and each of them, as a professional engineering corporation, owed Plaintiffs and the Class a cognizable duty to exercise that degree of care consistent with the greater degree of knowledge and skill possessed by design professionals, in providing Plaintiffs and the Class with safe drinking water and the maintenance of their tools and equipment used for such acts.

320.    Plaintiffs and the Class had a right to and did rely upon the LAN Defendants' professional expertise and ethical obligations in connection with Defendants' administration of placing the Flint Water Treatment Plant into operation using the Flint River as a primary source.

321.    The LAN Defendants, and each of them, negligently, gross negligently, recklessly, willfully, wantonly, and/or intentionally created the immediate and continuing contamination of drinking water in and around the real property of Plaintiffs and Class Members.

322.   The LAN Defendants' duties to Plaintiffs and the Class included, but were not limited to, the duty to properly administer bringing the Flint Water Treatment Plant into operation using the Flint River as a primary source, to do so in such a manner that would not endanger the health and property of Plaintiffs and the Class; take other actions consistent with the greater degree of knowledge and skill possessed by design professionals; and/or the duty to report to public authorities the dangers posed to public health and property that would result from the failure to install and/or provide proper corrosion controls when using the Flint River.

323.   Upon learning of the release of the contaminants, the LAN Defendants owed Plaintiffs and the Class a professional duty to remediate, contain, and eliminate the contamination before it injured Plaintiffs, the Class and their property and/or to minimize the damage to Plaintiffs, the Class and their property.

324.   The LAN Defendants breached that duty by failing to timely notify public authorities of the dangers posed to the Plaintiffs and the Class of the contamination of Flint's drinking water that would result from the failure to install and/or provide proper anti-corrosive treatment when using the Flint River as a primary source of drinking water, and, consequently, the presence of lead and other contaminants in the homes and rental properties of Plaintiffs and Class Members.

325.   As a result of the LAN Defendants' breaches of their duty to timely notify, Plaintiffs and the Class were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs and the Class have expended and/or

73

will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' professional negligence for many years into the future.

326.   The LAN Defendants negligently breached their duties to the Plaintiffs and the Class to ensure that the Flint water supply was safe and sufficiently secure as to prevent the release of the contaminants into the water facilities and, consequently, the homes and rental properties of Plaintiffs and Class Members.

327.   The LAN Defendants willfully and wantonly breached their legal duty to properly bring the Flint Water Treatment Plant into operation, despite full knowledge of the lack of corrosion controls in place and the threat it poses to human health and safety.

328.   Defendants' breaches of their duties were direct and proximate causes of Plaintiffs' and Class Members' damages and the imminent, substantial and impending harm to their homes, rental properties and health.

329.   The LAN Defendants owed each and every one of these Plaintiffs and the Class a duty to warn that the aforementioned contamination of Flint's water supply might occur.

330.   The LAN Defendants breached that duty by failing to warn the Plaintiffs and the Class of the likelihood of lead and other toxic chemicals contaminating the Flint water supply, and, consequently, the homes and rental properties of Plaintiffs and Class Members.

331.   As a result of Defendants' breaches of their duty to warn, Plaintiffs and the Class were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

332.   Plaintiffs and the Class suffered foreseeable injuries and damages as a proximate result of said Defendants' negligent breach of their duties as set forth above.  At the time Defendants breached their duties to Plaintiffs and the Class, Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiffs and the Class so apparent as to entitle them to be protected against such actions or inactions.

333.   Accordingly, Plaintiffs and the Class seek damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs and the Class to their original position, including, but not limited to the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injuries to persons, and consequential damages flowing from the negligence which are the natural and proximate result of Defendants' conduct in an amount to be proved at trial.

## **PUNITIVE DAMAGES**

334.   Plaintiffs and the Class hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 though 334 as if fully restated herein.

335.   Upon information and belief, Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the foregoing property damage, nuisances, and trespasses upon the persons and properties of Plaintiffs and the Class, disregarding their protected rights.

336.   Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to:

    a.   failure to provide safe drinking water to the residents of Flint;

    b.   failure to implement adequate corrosion controls for Flint River water; and

    c.   underestimating the seriousness of the lead contamination in Flint's water system.

337.   Defendants have caused great harm to the property and water supplies of Plaintiffs and the Class and demonstrated an outrageous conscious disregard for their safety with implied malice, warranting the imposition of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, this Complaint is being plead in avoidance of governmental immunity and the Defendants' defense of governmental immunity is voidable due to the proprietary function and gross negligence exceptions as well as all other relevant

exceptions and Plaintiffs and the Class demand judgment against Defendants, and

each of them, jointly and severally, and request the following relief from the Court:

    a.  an order declaring the conduct of defendants unconstitutional;

    b.  an order of equitable relief to remediate the harm caused by Defendants unconstitutional conduct including repairs or property, establishment of a medical monitoring fund, and appointing a monitor to oversee the water operations of Flint for a period of time deemed appropriate by the court;

    c.  an award for general damages;

    d.  an order for an award of compensatory damages;

    e.  an order for an award of punitive damages;

    f.  an order for an award of actual reasonable attorney fees and litigation expenses; and

    g.  an order for all such other relief the court deems equitable.

Respectfully submitted,

**NAPOLI SHKOLNIK PLLC**

By:   /s/ Hunter Shkolnik
Hunter Shkolnik, ##2031458NY
Paul J. Napoli, #2513141NY
1301 Avenue of the Americas, Tenth Floor
New York, NY, 10019
(212) 397-1000
hunter@napolilaw.com
pnapoli@napolilaw.com

**SLATER SLATER SCHULMAN LLP**

By:   /s/ Adam Slater
Adam P. Slater, *Pro Hac Pending*
Jonathan E. Schulman, *Pro Hac Pending*
909 Third Avenue, Twenty Eighth Floor
New York, NY, 10022
(212) 922-0906
aslater@sssfirm.com
jschulman@sssfirm.com

Dated: March 18, 2016